In The

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

**NO. 09-17-00118-CR**
_____

**TERRANCE LAMICHAEL CANADY, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the Criminal District Court**
**Jefferson County, Texas**
**Trial Cause No. 16-26028**

**MEMORANDUM OPINION**

A jury found Terrance Lamichael Canady guilty of robbery. Canady pleaded "true" to the enhancement paragraph in the indictment, elected to have the trial court assess punishment, and the trial court sentenced Canady to fifteen years of confinement. In his sole appellate issue, Canady challenges the sufficiency of the evidence supporting the jury's verdict. We affirm as reformed.

1

## The Indictment

A grand jury indicted Canady for the offense of robbery and alleged that on or about July 15, 2016, Canady

> did then and there while in the course of committing theft of property owned by [K.D.],[1] hereafter styled the Complainant, and with intent to obtain and maintain control of the property, intentionally, knowingly and recklessly cause[d] bodily injury to the Complainant by dragging [K.D.] with a vehicle[.]

The indictment included an enhancement paragraph alleging Canady had previously been convicted of the third-degree felony of possession of a controlled substance.

## Evidence

### Testimony of K.D.

K.D. testified that she met Canady online in October 2013 and that he was living in Houston. They began dating and he "stayed [at K.D.'s house] and then he left and then he came back and then . . . stayed for like over a year." K.D. testified she "started finding out lies[]" and she suspected Canady was using drugs. According to K.D., Canady "changed[]" when he was on drugs and their relationship was "off and on[]" until she "was trying to get out of the relationship." K.D. testified

---

[1] We use initials to refer to the alleged victim and initials or relational nouns to refer to family members and juveniles. *See* Tex. Const. art. I, § 30(a)(1) (granting crime victims "the right to be treated with fairness and with respect for the victim's dignity and privacy throughout the criminal justice process[]").

that they were involved in a physical altercation and she protected herself and hit Canady when Canady was "beating [her] in [her] head and [her son] going back and forth." They stopped talking for about a month and a half, and then got back together. K.D. testified that she found out Canady had "started seeing someone else" while he was still in a relationship with K.D., and she confronted him. According to K.D., she and Canady broke up in February of 2016, but Canady told her he wanted to get back together. K.D. testified that after she left him Canady threatened suicide and K.D. eventually changed her phone number because Canady kept on calling.

K.D. testified that on July 15, 2016, she was playing slot machines at the corner store on Blanchette and 4th Street in Jefferson County, and she had her daughter, N.B., with her. According to K.D., Canady knew she went to that store regularly and that he came in the store that day. K.D. testified that Canady "was aggressive, started fussing[,]" and she walked out because she did not want Canady to embarrass her in the store. K.D. testified that Canady and N.B. followed her out of the store. According to K.D., she was behind the truck and she had her keys and wallet in her hand and her wallet was open. K.D. testified that Canady asked if they could get back together and she told him they would never get back together. Canady then asked where his ID was and grabbed her keys. She asked for her keys back, and after he did not give them back she reached to try to grab them from him. He knocked

3

her hand and her wallet fell, causing her money, cards, and everything [to] spill out. K.D. testified that as she was picking up her wallet and the items that had spilled out, Canady took her keys and got in the truck that he had arrived in at the store and started the vehicle. She opened the passenger-side door, reached across a male in the passenger seat and as she attempted to grab her keys from inside the vehicle, Canady "sped off with [K.D.] in the truck[.]"

When asked if Canady dragged her by the car, K.D. answered, "When he sped off, you know how you just go backwards because someone take off and you don't expect it to happen and I just remember trying to hold on . . . and I just flew out the car." She remembered falling back and rolling, seeing "scars everywhere" and screaming. She looked up and saw her daughter, picked up her money that was on the ground, and called 911. She told 911 her location, what happened, that she "got drug by the car" because "that's what it felt like[,]" and how Canady took off with her keys. K.D. testified that she was hurting, she "[f]elt like [she] was on fire[,]" and her chest and knee were "scratched up[]" and her thigh, lip, and toes were "scraped up." The keys Canady took were K.D.'s house and vehicle keys, and she feared that Canady was going to do damage to her house or vehicle. Because she did not get her keys back that evening, K.D. had to get her car towed home and change the locks at

4

her house. K.D. explained that she subsequently got her keys back after Canady revealed that he left them in a dumpster at another location.

A recording of K.D.'s 911 call was played for the jury and K.D. testified that she said on the recording, "He tried to kill me" and "He drug me by the car[.]" Photographs taken by law enforcement of her injuries were admitted into evidence. K.D. agreed that the injuries depicted in the photographs were a result of the incident and that they did not exist prior to "being drug by the truck[.]" She agreed that the only reason he got away with her keys was "because he took off in that truck and drug [her.]"

Testimony of K.D.'s Daughter

N.B., K.D.'s ten-year-old daughter, testified that Canady is her mom's ex-boyfriend and she identified him in the courtroom. N.B. explained that on the day of the incident she was at the store that is also a game room. N.B. testified that Canady came into the store and was talking to her mother. When N.B. did not see her mother in the store she went outside and saw her mother and Canady behind her mother's truck in the parking lot. According to N.B., her mother had her keys in her hand, Canady grabbed the keys, and her mother's wallet fell on the ground. N.B. testified that her mother's debit card, driver's license, and some cash fell out of her wallet. She saw Canady turn and run back to his truck and she heard her mother say, "Give

5

me back my keys[.]" According to N.B., Canady's brother had come into the store with Canady and was in the driver's-side back seat of the truck, and she did not see if anyone was on the passenger's side. N.B. testified she ran by the side of the truck and saw her mother jump inside the passenger side. N.B. testified that her mother "stepped on that thing to get in the truck and like when he sped off, like he went really fast . . . [s]he like slipped and a little bit and she fell right when he got to the corner of the street and she scraped herself up[.]" According to N.B., she was scared because her mother was hurt, and it appeared she hurt her lip, elbows, knuckles, knees, foot and breast.

Testimony of K.D.'s Sister

K.D.'s sister testified that her sister had dated Canady for some years and the relationship was "rocky towards the end." K.D.'s sister testified she received a call from K.D. on July 15, 2016. K.D.'s sister went to the store and described K.D.'s appearance as "[d]rug, scars, mouth bleeding, breasts." K.D.'s sister left with N.B. and K.D. had given her sister Canady's phone number to try to locate K.D.'s keys. K.D.'s sister got ahold of Canady, and he told her the keys were in a dumpster "on Washington and Goliad[,]" but K.D.'s sister only found an empty key ring. She called Canady again and he gave her the location of the dumpster and this time K.D. was able, with N.B.'s help, to locate the keys. According to K.D.'s sister, when she

6

talked to Canady after the incident he admitted K.D. had been hurt and that he had "messed up."

Testimony of Officer Jessie Lisenby

Jessie Lisenby, a police officer with the Beaumont Police Department, testified he was on patrol on July 15, 2016, and was dispatched to a convenience store near 4th and Blanchette regarding a "woman who had possibly been dragged by a car[.]" Officer Lisenby arrived at the location and found a woman that "had been roughed up[,]" was "extremely hysterical, very animated, running around the parking lot[,]" and "was screaming, crying, hollering, pointing." She was saying "he took my keys, he took my keys[.]" Officer Lisenby testified EMS was called and a report was filed. According to Officer Lisenby, the woman's injuries appeared to be "road rash" and were consistent with someone who had fallen on pavement and consistent with the story the woman reported about her coming out of a vehicle. Officer Lisenby did not make any inquiry whether the store had surveillance video inside the store or outside in the parking lot.

Testimony of Detective Charla Phillips

Charla Phillips, a detective with the City of Beaumont Family Violence Unit, testified that on July 18, 2016, she received a case to investigate Canady for robbery and involving family violence against K.D. According to Detective Phillips, K.D.

initially did not want to pursue criminal charges against Canady because she was afraid he would retaliate. Detective Phillips testified that she obtained K.D.'s statement, and once K.D. decided to pursue criminal charges against Canady, Detective Phillips went to the convenience store a few weeks after the incident to inquire about any surveillance video. Detective Phillips testified that she was informed that even if there had been video of the incident it would have been overwritten by more video because the recording starts over after seven days and the seven-day window had passed.

Detective Phillips testified she contacted Canady, who voluntarily came to the police department and gave a statement on September 14, 2016. According to Detective Phillips, she read Canady his *Miranda* rights, Canady voluntarily signed a document regarding the *Miranda* rights Phillips read, and the video statement depicts her reading the *Miranda* rights and Canady signing the original document stating he reviewed those rights. Canady's video statement was then admitted into evidence and played for the jury. Detective Phillips testified that during the video statement, Canady admitted having an altercation with K.D. outside the store, that K.D. chased him to the car and reached inside the vehicle to grab him, that he sped off while K.D. was reaching in the car and K.D. was injured, and Canady told K.D.'s sister and K.D. that the keys were "[s]omewhere on Washington Boulevard."

Detective Phillips testified that every time she asked Canady about K.D.'s keys, Canady would get nervous and avoided talking about the keys. Detective Phillips testified she believed she had probable cause to ask for a warrant to be issued for Canady's arrest for robbery. In the video, Canady stated that he and K.D. had an altercation outside, he "broke loose" and ran to the car, K.D. chased him, his brother and a friend were in the car with him, and then when he got back into his vehicle and drove off, K.D. fell out of the car and hit the ground while trying to open the passenger door to "attack [him] some more." According to Canady, she had bruises and she later told him that she lost her keys during the struggle. He claimed in his video statement that he told K.D.'s sister to look for the keys on Washington Boulevard, but that he did not take anything or her keys.

Analysis

In one issue on appeal, Canady challenges the sufficiency of the evidence supporting the jury's verdict. Canady argues that the State failed to adduce sufficient evidence that any bodily injury was caused by dragging K.D. with a vehicle. According to Canady, the record is clear that K.D. fell out of the vehicle when Canady sped off and that she received injuries from striking the pavement and not from being dragged by a vehicle. Canady asserts that "[a]llowing the conviction to stand in the absence of sufficient evidence that [he] dragged [K.D.] with a vehicle

9

affected his substantial rights to due process[]" and he "stands convicted of committing acts that clearly did not occur."

In reviewing the legal sufficiency of the evidence, we view the evidence in the light most favorable to the verdict to determine whether any rational factfinder could have found the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979); *Temple v. State*, 390 S.W.3d 341, 360 (Tex. Crim. App. 2013). "The jury is the sole judge of credibility and weight to be attached to the testimony of witnesses." *Temple*, 390 S.W.3d at 360. We give full deference to the jury's responsibility to fairly resolve conflicts in the testimony, to weigh evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007). We may not substitute our judgment for that of the factfinder concerning the weight and credibility of the evidence. *King v. State*, 29 S.W.3d 556, 562 (Tex. Crim. App. 2000). When faced with conflicting evidence, we presume the trier of fact resolved conflicts in favor of the prevailing party. *See Turro v. State*, 867 S.W.2d 43, 47 (Tex. Crim. App. 1993).

A person commits robbery if, "in the course of committing theft" and "with intent to obtain or maintain control of the property," he "intentionally, knowingly, or recklessly causes bodily injury to another[.]" Tex. Penal Code Ann. § 29.02(a)(1) (West 2011). Theft is the unlawful appropriation of property with the intent to

10

deprive the owner of the property. Tex. Penal Code Ann. § 31.03(a) (West Supp. 2017).[2]

"[S]ufficiency of the evidence should be measured by the elements of the offense as defined by the hypothetically correct jury charge for the case." *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997); *see also Johnson v. State*, 364 S.W.3d 292, 294 (Tex. Crim. App. 2012). The Texas Court of Criminal Appeals has described the law as "authorized by the indictment" to be "the statutory elements of the offense . . . as modified by the charging instrument." *Curry v. State*, 30 S.W.3d 394, 404 (Tex. Crim. App. 2000). However, the hypothetically correct jury charge does not necessarily have to track exactly the charging instrument's allegations and "need not incorporate allegations that give rise to immaterial variances." *See Johnson*, 364 S.W.3d at 294 (quoting *Gollihar v. State*, 46 S.W.3d 243, 253, 256 (Tex. Crim. App. 2001)).

In *Johnson*, the appellant was charged with aggravated assault by causing serious bodily injury. *See Johnson*, 364 S.W.3d at 298. On appeal, the appellant claimed that a variance between the charging instrument and proof rendered the evidence legally insufficient to support his conviction. *See id.* at 293. The variance

---

[2] We cite to the current version of the statute because subsequent amendments do not affect our disposition.

11

in that case involved the charged acts of "hitting the victim with his hand" and "twisting the victim's arm with his hand" versus the proved act of "throwing the victim against the wall." *See id.* at 293, 298. The Texas Court of Criminal Appeals explained the offense of aggravated assault is a result-of-conduct crime with the focus being on the victim and the bodily injury inflicted, not what caused the victim's injury. *See id.* at 298. The Court reasoned that the description of the act that caused the serious bodily injury does not "define or help define the allowable unit of prosecution for this type of aggravated-assault offense, so the variance at issue cannot be material." *See id*. The Court concluded that the variance involved immaterial non-statutory allegations, and therefore, the variance did not render the evidence legally insufficient. *See id.* at 299.

In the present case, Canady was charged with robbery, or theft causing bodily injury. Canady does not argue that the victim did not receive bodily injuries, but he argues the variance in this case involves whether the bodily injury to K.D. was caused "by dragging her with a vehicle[]" versus what Canady describes as K.D. falling out of the vehicle.

The offense of robbery involves a theft and bodily injury and it is a result-oriented offense. *See Garfias v. State*, 424 S.W.3d 54, 60-61 (Tex. Crim. App. 2014). As such, the focus is on the bodily injury inflicted on K.D. during the theft and not

12

what caused her injuries. The alleged variance here, like in *Johnson*, involved immaterial non-statutory allegations and would not render the evidence legally insufficient. *See Johnson*, 364 S.W.3d at 298-99.

Furthermore, even if the State was required to prove that K.D.'s bodily injury was caused by Canady dragging K.D. with a vehicle, we conclude that, considering the evidence in the light most favorable to the verdict, a rational jury could have found Canady guilty of robbery as alleged in the indictment. Based on K.D.'s testimony, the wording on the 911 call where she describes being dragged by the car, and pictures of her injuries, the jury could have found that she was dragged by the car. We overrule Canady's sole appellate issue.

We note that the section of the judgment entitled "Punishment Assessed by[]" recites "Jury," whereas the appellate record indicates Canady elected to have the trial court assess punishment and the trial court assessed punishment. This Court has the authority to reform the trial court's judgment to correct clerical errors. *See* Tex. R. App. P. 43.2(b); *Bigley v. State*, 865 S.W.2d 26, 27 (Tex. Crim. App. 1993). We therefore reform the judgment to reflect that the trial court assessed Canady's punishment. *See id.*

Having overruled Canady's issue, we affirm the judgment of the trial court as reformed.

AFFIRMED AS REFORMED.

_____
LEANNE JOHNSON
Justice

Submitted on January 4, 2018
Opinion Delivered August 29, 2018
Do Not Publish

Before Kreger, Horton, and Johnson, JJ.